UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ROBERT EUGENE WILLIAMSON,

    Plaintiff,

v.                                              CASE NO. 3:17-cv-1321-J-MCR

ACTING COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,

    Defendant.
_____/

## **MEMORANDUM OPINION AND ORDER**[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision denying his application for Supplemental Security Income ("SSI"). Following an administrative hearing held on February 27, 2017, the assigned Administrative Law Judge ("ALJ") issued a decision, finding Plaintiff not disabled since November 20, 2013, the protective filing date of the application.[2] (Tr. 14-28, 52-81.) Based on a review of the record, the briefs, and the applicable law, the Commissioner's decision is **REVERSED and REMANDED**.

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. (Doc. 15.)

[2] Although Plaintiff alleged disability beginning on June 24, 2013, SSI "is not payable prior to the month following the month in which the application was filed." (Tr. 17, 213.) Nevertheless, the ALJ noted that he had considered the complete medical history consistent with 20 C.F.R. § 416.912(d). (Tr. 17.)

1

### I. Standard

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

### II. Discussion

Plaintiff raises two issues on appeal. First, Plaintiff argues that the ALJ failed to properly evaluate his symptoms in accordance with Social Security

Ruling ("SSR") 16-3p, and failed to take into consideration his inability to afford medical treatment, as he was a homeless person with no income and no medical insurance.  Second, Plaintiff argues that the ALJ's findings regarding his mental limitations are not supported by substantial evidence.  The Court finds that a remand is required as to the first issue and, therefore, does not address the second issue.

### A. Standard for Evaluating Pain and Other Subjective Symptoms

When a claimant seeks to establish disability through his own testimony of pain or other subjective symptoms, the Eleventh Circuit's three-part "pain standard" applies.  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (per curiam).  "If the ALJ decides not to credit such testimony, he must articulate explicit and adequate reasons for doing so."  *Id*.

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Id.*

Once a claimant establishes that his "pain is disabling through objective medical evidence that an underlying medical condition exists that could reasonably be expected to produce the pain," pursuant to 20 C.F.R. § 416.929, "all evidence about the intensity, persistence, and functionally limiting effects of

pain or other symptoms must be considered in addition to the medical signs and laboratory findings in deciding the issue of disability." *Foote*, 67 F.3d at 1561; *see also* SSR 16-3p[3] (stating that after the ALJ finds a medically determinable impairment exists, the ALJ must analyze "the intensity, persistence, and limiting effects of the individual's symptoms" to determine "the extent to which an individual's symptoms limit his or her ability to perform work-related activities").

As stated in SSR 16-3p:

In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ must] examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.
. . .
In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms.[4] The determination or decision

---

[3] SSR 16-3p rescinded SSR 96-7p, eliminating the use of the term "credibility," and clarifying that "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p.

[4] These factors include: (1) a claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the claimant's pain or other symptoms; (5) any treatment, other than medication, received by the claimant to relieve the pain or other symptoms; (6) any measures (other than treatment) used to relieve the pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping
(continued...)

> must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.
> . . .
> In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person. Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities[.]

SSR 16-3p.

"[A]n individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed" will also be considered "when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities." *Id.* "[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, [the adjudicator] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." *Id.* However, the adjudicator "will not find an individual's symptoms

---

[4](...continued)
on a board); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3); SSR 16-3p.

inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." *Id.* In considering an individual's treatment history, the adjudicator may consider, *inter alia*, one or more of the following:

- That the individual may have structured his or her activities to minimize symptoms to a tolerable level by avoiding physical activities or mental stressors that aggravate his or her stressors;
- That the individual may receive periodic treatment or evaluation for refills of medications because his or her symptoms have reached a plateau;
- That the individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms;
- That the individual may not be able to afford treatment and may not have access to free or low-cost medical services;
- That a medical source may have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual;
- That due to various limitations (such as language or mental limitations), the individual may not understand the appropriate treatment for or the need for consistent treatment.

*Id.*

### B. The ALJ's Decision

At step two of the five-step sequential evaluation process, the ALJ found that Plaintiff had the following severe impairments: Gitelman's syndrome with hypokalemia and hypomagnesemia, hypothyroidism, chronic obstructive

pulmonary disease ("COPD"), and affective and anxiety disorders.[5] (Tr. 19.) Then, the ALJ found that Plaintiff was capable of performing less than the full range of sedentary work:

> [The claimant] would require work that is, at most, very low semi-skilled work in nature, which are tasks performed so frequently as to be considered routine, even though the tasks themselves might not be considered simple. He could only lift or carry less than 10 pounds frequently and 10 pounds occasionally (from very little, up to 1/3 of an 8-hour workday). He could stand and/or walk for a total of 2 hours and sit for a total of 6 hours (with normal breaks) in an 8-hour workday. He should avoid frequent pushing and pulling motions with his lower extremities (foot controls) within the aforementioned weight restrictions. He should avoid activities requiring fine constant manipulation with fingering with both hands. Due to mild to moderate pain and medication side effects, he should avoid hazards in the workplace, such as unprotected areas of moving machinery; heights; ramps; ladders; scaffolding; and on the ground, unprotected areas of holes and pits. He should be restricted to a work environment with stable temperatures. He could perform each of the following postural activities occasionally: balancing, stooping, crouching, kneeling, and crawling; but not the climbing of ropes or scaffolds, and of ladders exceeding 6 feet. He had non-exertional mental limitations which frequently affect his ability to concentrate upon complex or detailed tasks, but he would remain capable of understanding, remembering, and carrying out the job instructions defined earlier; making work related judgments and decisions; responding appropriately to supervision, co-workers and work situations; and dealing with changes in a routine work setting. He should be allowed brief restroom breaks every hour with facilities to be located within a reasonable distance. He is not able to read very small print, but is able to view a computer screen, or read an ordinary newspaper or book print.

---

[5] "Gitelman['s] syndrome is an autosomal recessive kidney disorder characterized by hypokalemic metabolic alkalosis with hypocalciuria, and hypomagnesemia. It is caused by loss of function mutations of the thiazide-sensitive sodium-chloride symporter (also known as NCC, NCCT, or TSC) located in the distal convoluted tubule." (Tr. 773.)

(Tr. 21-22.)

In making this finding, the ALJ discussed Plaintiff's subjective complaints and daily activities, the treatment notes, the objective medical records, Dr. Choksi's examination findings and opinions, and the opinions of the State agency non-examining physicians, Dr. Hodes and Dr. Johnson. (Tr. 22-26.) The ALJ summarized Plaintiff's testimony, in part, as follows:

> The claimant testified that his Gitelman['s] syndrome causes fluctuating potassium and magnesium levels, which requires him to take frequent restroom breaks and causes muscle spasms. He has also been diagnosed with hypothyroidism, COPD, depression and anxiety. He has to take potassium supplements, which causes [sic] heartburn. He stated that overexertion causes him to lose too much potassium and he requires hospitalization. The hospital gives him potassium via IV fluids. He tries to drink Gatorade and eat bananas to keep his potassium level up. He stated that doctors have told him that there is no sure treatment for the disorder. He reiterated that the symptoms are primarily characterized as muscle spasm and cramping, which happens constantly throughout the day. He began experiencing depression and anxiety after he was diagnosed with Gitelman['s] syndrome (Hearing Testimony). The undersigned also considered the subjective complaints and limitations contained in reports previously filed by the claimant (Exhibit 4E, 7E, 10E, 16E, and 18E-19E).

(Tr. 22.)

The ALJ determined that although Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's "complaints suggest[ed] a greater severity of impairment than [could] be shown by the objective medical evidence alone," and that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms

8

[were] only partially consistent with the medical evidence and other evidence in the record." (Tr. 22-23.) The ALJ explained, in relevant part:

> The . . . medical records generally support the testimony that [Plaintiff] has fluctuating magnesium and potassium levels. However, the degree of alleged limitation is only partially consistent with the record. The lab work generally does not show especially low levels and the Gitleman's [syndrome] appears fairly well controlled with the potassium and magnesium supplements (Exhibit 26F-27F, 38F and 44F/13). He has not had recurrent hospitalizations for exacerbations or associated symptoms. He once appeared at the [emergency room] complaining of persistent cough. His potassium was especially low but he refused IV supplementation and signed out against the doctor [sic] recommendation (AMA) (Exhibit 32F). On September 3, 2016, he complained of body aches and chest pain. He expressed concern about his potassium level and complained of chest pain but he refused lab work, imaging studies or any other care and again signed out [against medical advice] (Exhibit 34F/4). Subsequent imaging and ECG testing were normal, noting a normal heart rate with no sinus rhythm or ischemic changes (Exhibit 35F/7). When he does accept treatment at [the emergency room], he is quickly stabilized with IV potassium supplementation and released (Exhibit 39F/40-5). Treatment notes dated October 24, 2016 state that he had been getting treatment at the [emergency room] because he could not afford to get his prescriptions [sic] supplements filled (Exhibit 40F/3).
>
> The physical exam findings are consistently essentially normal, except for when he presents to the emergency department for acute injury. The evidence suggest[s] he continues with mostly normal activities of daily living. . . .
>
> Overall, the record shows that the claimant suffers primarily from Gitelman's syndrome, a kidney disorder that causes imbalances in potassium, magnesium and calcium levels. The treatment records generally indicate that the condition is controlled with potassium and magnesium supplements when he is medication compliant. On occasion, his potassium level has dropped[,] requiring hospitalization. At the hospital, he is quickly stabilized after IV supplementation, if he accepts treatment and is discharged. The type of debilitating muscle spasm and cramping alleged is only

9

partially consistent with the record. The evidence also indicates that
he continues to perform activities of daily living consistent with a
retained ability to perform the reduced range of sedentary work
articulated and only partially consistent with the alleged severity of
pain and functional limitation. The treatment has also been mostly
conservative and non-aggressive in nature.

(Tr. 23-26.)

The ALJ added that he had "accommodated some of the complaints that [were] not well documented in the medical evidence," such as Plaintiff's "alleged chronic incontinence, which [was] only partially consistent and accommodated by allowing restroom breaks each hour with facilities within a reasonable distance." (Tr. 26.) The ALJ concluded that although Plaintiff "would not be able to perform the type of labor intensive landscaping and construction work he ha[d] performed in the past on a part-time basis, he would be able to perform jobs within the substantially reduced range of sedentary exertion work articulated." (*Id.*)

### C. Pertinent Hearing Testimony

At the February 27, 2017 hearing, Plaintiff testified that he had been told by a kidney specialist, Dr. Maria Theresa de Jesus, that "there was no sure treatment for [his Gitelman's syndrome]" and that it was "a guessing game." (Tr. 61.) Plaintiff explained:

> [T]hey told me the only way I could even get treated was [at] a
> university hospital, which [sic] I'm going to pretty much be like a
> Guiney [sic] pig. They're going to be guessing there too, and that's
> pretty much how the kidney specialist explained it to me. There was
> no sure treatment for it. All it was[,] was a guessing game. I mean
> they just upped my dose on the potassium not too long ago, the last
> time I was in the hospital[,] because I was taking nine pills and the

10

> lady told me[,] she says[,] anybody else takes nine of these a day,
> it's a [sic] poison. It'd kill them. Now, I'm taking ten of them a day. I
> mean they're -- it's a guessing game. I've been in and out [of] the
> hospital because of it. I mean[,] I tried to help my sister mow the
> grass, and I ended up in the hospital within three to four hours. . . .
> The Villages Hospital was the last time I was in the hospital and that
> was[,] I want to say[,] three months ago. That's when she upped my
> dose, and it was the original kidney doctor that had diagnosed me
> with it.

(Tr. 62-63.)

Although Plaintiff was able to see Dr. de Jesus while he was admitted at the Villages Hospital, he has been on a waiting list to see a kidney specialist at the Heart of Florida since 2012. (Tr. 65-66.) He testified that he cannot afford to see a kidney specialist at Shands. (Tr. 65.) He never worked full-time (Tr. 59), and at the time of the hearing, he was temporarily homeless, sleeping on friends' couches (Tr. 56; *see also* Tr. 147-48).

Plaintiff testified that he has constant muscle spasms all over his body due to low potassium and magnesium levels. (Tr. 60, 64-65 ("It's whatever muscle I'm working out or using at that time, it's going to cramp and it's going to have muscle spasms.").) Plaintiff stated that regardless of whether he is inside or outside, his potassium leaks out when he uses the bathroom and/or sweats. (Tr. 60, 62-64.) If he does not do anything, except eat and watch TV, it is "controllable." (Tr. 66.) Plaintiff tries to compensate by drinking Gatorade and eating bananas. (Tr. 64.) He stated that his supplements are ineffective and, in combination with the potassium-rich foods, they only make "the cramping more

11

bearable." (Tr. 62, 66.)

Plaintiff testified that the potassium supplements cause constant heartburn and the magnesium supplements cause him to "spend the majority of the day in the bathroom." (Tr. 61, 67 (stating that Plaintiff "end[s] up on the toilet . . . off and on all day" – "at least five to six hours a day").) Plaintiff stated that even Imodium is ineffective for his diarrhea. (Tr. 67; *see also* Tr. 325 ("My medicine makes me have diarrhea every day."); Tr. 329 (listing diarrhea as a side effect of the magnesium medications).) Plaintiff testified that he has been warned to rush to the hospital if he experiences lightheadedness or chest pains due to the risk of heart attack, heart failure, or stroke. (Tr. 65, 68.)

### D. Analysis

"Failure to follow prescribed medical treatment disqualifies a claimant from receiving [SSI] benefits." *Dawkins v. Bowen*, 848 F.2d 1211, 1212 (11th Cir. 1988).[6] However, "a claimant's inability to afford a prescribed medical treatment excuses noncompliance." *Id.* "Thus[,] while a remediable or controllable medical condition is generally not disabling, when a 'claimant cannot afford the prescribed treatment and can find no way to obtain it, the condition that is disabling in fact continues to be disabling in law.'" *Id.* at 1213.

---

[6] "In order to deny benefits on the ground of failure to follow prescribed treatment, the ALJ must find that had the claimant followed the prescribed treatment, the claimant's ability to work would have been restored. This finding must be supported by substantial evidence." *Dawkins*, 848 F.2d at 1213.

12

Here, the ALJ substantially relied on Plaintiff's non-compliance with prescribed medical treatment without considering his inability to afford treatment, which is well documented in the record. (*See, e.g.*, Tr. 359 ("The claimant's financial situation precludes him from having extensive specialist treatment with a renal clinic, despite his primary doctor's attempt to set this up[.]"); Tr. 471 (noting that Plaintiff declined genetic testing, which would require "significant amount of money," and indicated that he would try to apply for Medicaid); Tr. 589 (noting that Plaintiff was at "100% level of poverty"); Tr. 773 (noting, on October 24, 2016, that Plaintiff "has not had money or insurance to follow up with [a medical doctor] or get his [prescription] filled[,] so [he] has been ge[t]ting his care" through emergency room visits); Tr. 776 (noting that Plaintiff would need laboratory testing done when he could afford it); Tr. 785 ("Patient has been advised to go to Shands Hospital[,] but for reasons of insurance [that] has not been possible."); Tr. 813 (stating that Plaintiff is homeless and his family has turned its back on him); Tr. 823 (noting "financial problems due to being unemployed").)

As in *Dawkins*, the ALJ's conclusion that Plaintiff retained the RFC to return to work seems "inextricably tied to the finding of noncompliance," *Dawkins*, 848 F.2d at 1214. (*See* Tr. 25 ("The treatment records generally indicate that the condition is controlled with potassium and magnesium supplements *when he is medication compliant*.") (emphasis added); Tr. 25-26 ("At the hospital, he is quickly stabilized after IV supplementation, *if he accepts treatment* and is

13

discharged.") (emphasis added); Tr. 23 ("*When he does accept treatment* at [the emergency room], he is quickly stabilized with IV potassium supplementation and released[.]") (emphasis added); *see also* Tr. 23 ("His potassium was especially low[,] *but he refused IV supplementation* and signed out against the doctor [sic] recommendation[.] . . . He expressed concern about his potassium level and complained of chest pain[,] but *he refused lab work, imaging studies or any other care* and again signed out [against medical advice.]") (emphasis added).)

Although the ALJ noted Plaintiff's inability to afford his prescribed supplements (Tr. 23), the ALJ did not seem to consider the impact of Plaintiff's poverty, homelessness, and lack of medical insurance on his non-compliance with treatment recommendations. Instead, the ALJ pointed out that Plaintiff's treatment has been "mostly conservative and non-aggressive." (Tr. 26.) However, the ALJ does not identify (and the record does not seem to include) any recommendations for more aggressive or less conservative treatment of Plaintiff's impairments. As Plaintiff could not afford to see a specialist at a renal clinic (*see* Tr. 506, 553, 589, 595, 601, 603, 605, 715), it is unclear what, if any, treatment options were available for his hypokalemia (*see* Tr. 785 ("I [] have no experience with this syndrome and cannot really provide any suggestion.")). As Dr. de Jesus[7] explained to Plaintiff, even if he went to a university hospital for treatment

---

[7] Dr. de Jesus saw Plaintiff while he was admitted at the hospital, but he could not see her again because she did "not offer pro bono services." (Tr. 506.)

of his Gitelman's syndrome, it would still be "a guessing game" because "there was no sure treatment" for this syndrome. (Tr. 61-62; *see also* Tr. 813 ("[T]he medicine makes me worry about going back and forth to the hospital because the medicine is not treating me completely. . . . Right now, they're pretty much guessing on how to treat it.").)

Although the ALJ states that Plaintiff's Gitelman's syndrome appears "fairly well controlled with the potassium and magnesium supplements" (Tr. 23), Dr. de Jesus told Plaintiff that his potassium level would never be normal (Tr. 471), and her statement seems supported by the laboratory results in the record. While normal potassium levels range from 3.5 to 5.0, Plaintiff's levels were: 3.4 on August 7, 2014 (Tr. 537); 3.2 on January 30, 2015 and May 1, 2015 (Tr. 577, 610); 2.8 on June 1, 2015 (Tr. 735); 2.4 on May 15, 2016 (Tr. 642, 644); 3.1 on June 10, 2016 (Tr. 725); 2.9 on September 2, 2016 and September 3, 2016 (Tr. 667, 672); 3.1 on September 4, 2016 (Tr. 683); 2.5 on October 16, 2016 (Tr. 773); 2.6 on December 7, 2016 (Tr. 784); and 2.1, 2.7, 2.8, and 3.4 on December 8, 2016 (Tr. 781, 783-85, 796). (*Cf.* Tr. 553 (noting a potassium level of 3.9 on September 2, 2014 after a high dose of potassium as well as a potassium sparing diuretic).) Also contrary to the ALJ's statement that Plaintiff "has not had recurrent hospitalizations" (Tr. 23), a December 2016 progress note shows that Plaintiff was in the hospital for three days and had been hospitalized twice in the previous month. (Tr. 809.) Plaintiff was also admitted for chest pain and other

15

hypokalemia-related, acute symptoms on a number of other occasions, including on January 31, 2015, May 15, 2016, August 10, 2016, and September 3, 2016. (Tr. 584, 637, 639-40, 659-660, 787.)

The ALJ also notes instances when Plaintiff "refused IV supplementation and signed out against [medical advice]" and "refused lab work, imaging studies or any other care." (Tr. 23.) While it is true that in May 2016, Plaintiff signed out from the hospital against medical advice, the record shows that he left, because his "[m]other needed the car he was driving to go to work at Walmart." (Tr. 643.) During that same visit, Plaintiff was initially unable to tolerate the high dose of potassium, but he was able to absorb the lower dose without complaint, and was discharged in stable condition. (Tr. 637, 639-40.) In August 2016, after Plaintiff left the Villages Regional Hospital, the record shows that he went to Putnam Hospital, where he received potassium and was discharged. (Tr. 787.)

In sum, although there are instances when Plaintiff left without treatment (Tr. 584, 659-60, 791), the ALJ does not seem to consider the reasons therefor. Where, as here, the record is underdeveloped as to whether Plaintiff's financial status prevented him from receiving treatment, the Court is unable to determine whether the ALJ's credibility determination and RFC assessment are supported by substantial evidence. *See Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1269 (11th Cir. 2015) (per curiam) ("It is impossible to review whether the ALJ's decision is supported by substantial evidence if the record is not fully and fairly

16

developed."). As explained in *Henry*:

> Despite Henry's statement that he is unable to pay for continued medical treatment, including chiropractic care, the ALJ neither developed the record nor addressed Henry's financial ability to pursue a more rigorous course of treatment. As such, the ALJ failed to consider any good cause explanations for failure to seek medical treatment . . . .
>
> The ALJ's determination that Henry's 2012 testimony is not credible is not supported by substantial evidence because the ALJ failed to fully and fairly develop the record with respect to Henry's ability to pursue a more rigorous course of treatment. . . . The ALJ had an obligation to "scrupulously and conscientiously probe" into the reasons underlying Henry's course of treatment, yet there is nothing in the record indicating the ALJ inquired into or considered Henry's financial ability to seek an alternate treatment plan. Instead, the ALJ focused on the absence of aggressive treatment as a proxy for establishing disability.

*Id.* at 1268-69. As in *Henry*, the ALJ in the present case does not seem to consider any explanation for Plaintiff's failure to pursue further treatment, despite multiple references in the record to lack of insurance and lack of financial resources.

Further, the ALJ here notes that when Plaintiff accepts treatment, "he is quickly stabilized with IV potassium supplementation." (Tr. 23.) However, the laboratory results cited earlier do not seem to indicate stabilization. In fact, the only kidney specialist that Plaintiff saw, stated that his potassium level would never be normal. (Tr. 471.) Plaintiff was in and out of the emergency department not only because there was "no sure treatment" for his Gitelman's syndrome and the doctors who saw him had no experience with it (Tr. 61-62, 785, 813), but also

17

because he could not afford a consult with a kidney specialist at a renal clinic.

In addition, in finding that Plaintiff's "condition is controlled with potassium and magnesium supplements" (Tr. 25), the ALJ does not seem to consider the side effects from the treatment. Although the ALJ notes Plaintiff's "alleged chronic incontinence," which he accommodates by "allowing restroom breaks each hour with facilities within a reasonable distance" (Tr. 26), he does not even mention Plaintiff's chronic diarrhea, which is also documented in the record (*see, e.g.*, Tr. 325, 329, 781, 797, 809). Plaintiff testified that as a result of the magnesium supplements, he spends at least five to six hours a day in the bathroom, despite also taking Imodium. (Tr. 61, 67, 325.) The ALJ did not mention this testimony and did not seem to consider it in his credibility determination or in his RFC assessment.

Based on the foregoing, the Court cannot conclude that the ALJ's decision is supported by substantial evidence. Because the ALJ's conclusion that Plaintiff was not disabled seems "inextricably tied to the finding of noncompliance" with recommended treatment, the ALJ erred by failing to consider Plaintiff's inability to afford treatment. *Dawkins*, 848 F.2d at 1214. To the extent the ALJ found that Plaintiff's ability to work was restored as long as he followed any prescribed treatment, such a finding does not seem supported by substantial evidence, as shown above. *Id.* at 1213.

In light of this conclusion and the possible change in the RFC

assessment, the Court finds it unnecessary to address Plaintiff's arguments regarding his mental limitations.  See *Jackson v. Bowen*, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam); *Freese v. Astrue*, 2008 WL 1777722, at *3 (M.D. Fla. Apr. 18, 2008); *see also Demenech v. Sec'y of the Dep't of Health & Human Servs.*, 913 F.2d 882, 884 (11th Cir. 1990) (per curiam).  However, on remand, the ALJ is directed to reconsider Plaintiff's mental impairment(s) and any resulting limitations.

Accordingly, it is **ORDERED**:

1. The Commissioner's decision is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), with instructions to the ALJ to: (a) reconsider Plaintiff's symptoms and inability to afford medical treatment in accordance with SSR 16-3p; (b) reconsider Plaintiff's mental impairment(s) and any resulting limitations; (c) reevaluate Plaintiff's RFC assessment, if necessary; and (d) conduct any further proceedings deemed appropriate.

2. The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions, and close the file.

3. In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2)*, Case No. 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13, 2012).  This Order does not extend the time limits for filing a motion for attorney's

fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

**DONE AND ORDERED** at Jacksonville, Florida, on February 25, 2019.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record